## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Steven S., | Civ. No. 21-1201 (WMW/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

Stephanie M Balmer, Esq., Falsani, Balmer, Peterson & Balmer, counsel for Plaintiff.

Tracey Wirmani, Esq., Social Security Administration, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for supplemental security income ("SSI") and disability benefits. This matter is before the Court on the parties' cross-motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 22, 25.) This matter has been referred to the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636. For the reasons set forth below, this Court recommends that Defendant's motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied.

# BACKGROUND

## I.    Procedural History

On October 5, 2018, Plaintiff applied for Disability Insurance and SSI benefits under title II and XVI of the Social Security Act, alleging a disability onset date of August 1, 2017. (Tr. 194–206.)[1] The Social Security Administration ("SSA") denied Plaintiff's application and again on reconsideration. (Tr. 64–89, 90–122, 131–38.) Plaintiff requested a hearing, and a hearing before an Administrative Law Judge ("ALJ") was held on July 8, 2020. (Tr. 31–63, 139–40.) In a decision dated July 30, 2020, the ALJ proceeded through the sequential five-step evaluation process[2] and determined that Plaintiff was not disabled since his alleged disability onset date. (Tr. 10–20.) The Appeals Council denied Plaintiff's request for review on March 11, 2020, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981; (Tr. 1–6.)

---

[1]    Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record. (Doc. No. 21.) Referenced numbers refer to the Bates label in the bottom right corner of the record.

[2]    The ALJ must conduct a five-step evaluation to determine whether a claimant qualifies as "disabled." At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. Step two requires the ALJ to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." At step three, the ALJ determines whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listed impairment. Before step four, the ALJ determines the claimant's RFC. At step four, the ALJ determines whether the claimant has the RFC to perform the requirements of his past work. And at step five, the ALJ determines whether the claimant can do any other work considering his RFC, age, education, and work experience. *See* 20 C.F.R. § 404.1520.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 12.) At step two, the ALJ concluded that Plaintiff had the following medically determinable and severe impairments: degenerative disc disease status post laminoforaminotomy with lower extremity neuropathy; status post total hip arthroplasty; melanoma of the left big toe status post partial amputation; and obesity. (*Id.*) At step three, the ALJ determined that, while severe, none of Plaintiff's impairments, or a combination thereof, met or medically equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. (Tr. 13–14.) Before continuing to step four, the ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform "light work" as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations:

> [H]e can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. He is limited to frequent exposure to extreme cold, vibration, hazardous moving machinery, and unprotected heights. The claimant can occasionally use foot controls bilaterally and will require the opportunity to alternate between sitting and standing as frequently as every 30 minutes provided he will not be off task greater than 10%.

(Tr. 14–20.) At step four, the ALJ concluded that Plaintiff could perform the requirements of his past relevant work as an insurance sales agent. (Tr. 20.) Consequently, the ALJ found Plaintiff not disabled under the Act. (*Id.*) On May 12, 2021, Plaintiff appealed and commenced this action. (Doc. No. 1.) The administrative record in this matter was filed on October 29, 2021. (Doc. No. 21.) The parties' cross-motions for summary judgment are now before this Court for consideration. (Doc. Nos. 22, 25.)

## II.    Medical History

### a.  Lower back pain

Plaintiff is a male in his sixties who suffers from lower back pain. On September 26, 2017, Plaintiff visited urgent care at North Memorial Health when his back pain began to worsen. (Tr. 454.) A physical exam noted that his gait was antalgic, and he was assessed with "lumbar strain" and prescribed Naprozen, Tizadine, and Tramadol. (*Id.*) The next day, September 27, 2017, Plaintiff visited the emergency department at St. Luke's, again complaining of back pain. (Tr. 307.) Plaintiff stated that the medication prescribed by North Memorial Health had offered no relief, and he had difficulty walking. (*Id.*) After being given some additional medication, Plaintiff was able to ambulate seventy-five feet. (Tr. 309.) He was then prescribed Percocet and Ibuprofen, as well as a walker, and told to set up a follow-up appointment for ongoing management of his back pain. (*Id.*)

On September 29, 2017, Plaintiff met with Dr. Paul Jones for a complete physical examination. (Tr. 375.) The physical exam revealed Plaintiff's gait was "very compromised" and "unsteady" and that Plaintiff suffered from numbness and decreased sensation in his left foot and weakness. (Tr. 377.) Imaging of his lower back showed some degenerative changes but was "otherwise unremarkable." (*Id.*) Dr. Jones discussed with Plaintiff treating his lower back with heat and ice and referred Plaintiff to physical therapy with a plan to follow up in four to six weeks for a reevaluation. (Tr. 378.)

On October 2, 2017, Plaintiff called Dr. Jones's office stating he was still in pain. (Tr. 375.) Dr. Jones recommended he limit his activity and ordered an MRI. (*Id.*) The

subsequent MRI indicated L2-3 disc degeneration with diffuse disc bulge and mild narrowing of the spinal canal and left neural foramen; L4-5 disc degeneration with diffuse disc bulge and central disc protrusion with annular fissure, severe spinal canal narrowing, impingement of the traversing L5 nerve roots, and mild narrowing of bilateral neural foramina; L5-S1, disc degeneration with diffuse disc bulge but otherwise no spinal canal or neural foraminal narrowing; lumbar spondylosis bilateral facet arthropathy, and degenerative changes of the SI joints. (Tr. 312.) Plaintiff subsequently received an epidural steroid injection on October 10, 2017, in his lower back. (Tr. 370–71.)

Over the course of several months, Plaintiff continued treatment of his lower back. On October 24, 2017, a physical examination at the Twin Cities Spine Center by Dr. Ensor Transfeldt indicated that Plaintiff "has been ambulating with a walker because of pain" and was "able to ambulate with an antalgic gait" and able to "do a good tandem foot walk." (Tr. 405.) Plaintiff then received another epidural injection and a lumbar laminectomy. (Tr. 338–47, 436.) On November 2, 2017, about one week after the injection and laminectomy, Plaintiff complained of numbness in the bottom of his feet. (Tr. 408.) He continued to complain of numbness in both feet. (Tr. 409, 411 413, 415, 418.) A second MRI on December 18, 2017, showed the laminectomy had been successful with decompressing Plaintiff's nerves. (Tr. 310.) By February 14, 2018, several months after the laminectomy, Plaintiff had been having "really good days" and "really bad days" and had been attempting to go to the gym on a daily basis and doing light weights, stationary cycling, and swimming in a pool. (Tr. 418.) Plaintiff had also been using a disabled parking permit, which he reported had helped his symptoms. (*Id.*)

On June 8, 2018, Plaintiff had an office visit with Dr. Transfeldt where he continued to report significant relief after the laminectomy, but that he still felt residual numbness in his feet. (Tr. 420.) Dr. Transfeldt recommended an Electromyography ("EMG") to see whether Plaintiff suffered from peripheral neuropathy. (*Id.*) Dr. Transfeldt assured Plaintiff that he could carry on playing golf and his day-to-day activities despite the numbness symptoms. (*Id.*) A subsequent EMG showed no evidence of peripheral neuropathy. (Tr. 422.) Plaintiff reported on July 9, 2018, that he felt "significantly better than he was prior to" the laminectomy. (*Id.*) Dr. Transfeldt assured him the residual numbness would improve in the months to come. (*Id.*)

On June 28, 2018, Plaintiff reported during a visit to Dr. David Rippe at Abbot Northwestern Hospital that his lower back pain had improved but that his symptoms still worsened after ambulating for more than three blocks or sitting for more than two hours. (Tr. 352.) Dr. Rippe concluded that, based on the EMG of his lower extremities, there was evidence of acute denervation in the right and left S1 myotomes consistent with acute S1 radiculopathies bilaterally. (Tr. 354.)

On October 26, 2018, Plaintiff visited Dr. Transfeldt at the Twin Cities Spine Center, approximately one year after his laminectomy. (Tr. 424.) Plaintiff reported continuing pain but noted that he remained "fairly active" and that he biked and "played golf." (*Id.*) Dr. Transfeldt stated that Plaintiff had "significant improvement" after his lumbar laminectomy and noted upon examination "no obvious motor or sensory deficit involving the lower extremities." (*Id.*) He recommended a diagnostic hip injection with steroids for therapeutic benefit and that Plaintiff continue with his back exercises. (*Id.*)

By October 30, 2018, physical therapy session notes showed that Plaintiff continued to report aches, pain, numbness, and stiffness. (Tr. 510.) Plaintiff also reported that he had transitioned all of his needs to the ground floor of his home so that he did not have to use the stairs, and that he had difficulty with walking two to four city blocks. (*Id.*) Further physical therapy observations noted that Plaintiff demonstrated a "nonnantalgic gait" and had decreased step length with the left and no other deviations noted. (*Id.*)

Plaintiff continued with physical therapy for several weeks. On November 29, 2018, he reported "improvements in his walking distance abilities." (Tr. 504.) Plaintiff received another MRI in December 2019, which showed "no significant change" from his previous MRI in 2017. (Tr. 594, 608.) After reviewing the MRI image, Martha Magnuson, PA-C, recommended that Plaintiff continue with his physical therapy regimen and incorporate daily core strengthening exercise. (Tr. 594.) She also noted that Plaintiff had "certainly improved from prior to surgery, but has continued to struggle with these symptoms limiting his time for driving, standing and walking." (*Id.*) On June 3, 2020, Plaintiff reported intermittent back pain that had improved after his surgery, but that he still felt numbness symptoms in his feet. (Tr. 672.) Another EMG performed on June 11, 2020, indicated evidence of a chronic right L5 radiculopathy. (Tr. 641.)

### b.  Right hip

In addition to his lower back pain, Plaintiff also suffers from pain in the right side of his hip. Plaintiff reported this pain in October of 2018, when Plaintiff visited Dr. Transfeldt. (Tr. 424.) Plaintiff received hip injections to alleviate the pain on October 26, 2018 and December 11, 2018. (Tr. 429, 479.) On February 27, 2019, Plaintiff

visited with Dr. Brian O'Neill at the Twin Cities Orthopedics. (Tr. 473.) Plaintiff

reported that his hip pain interfered with his sleep and that his hip injections had not

provided him relief. (*Id.*) He reported having significant limitations in activities of daily

living. (*Id.*) A physical exam by Dr. O'Neill indicated "antalgic gait," normal sensation,

normal general motor strength, and restricted motion in hip. (Tr. 474.) Plaintiff was

diagnosed with grade four arthritis in his right hip. (*Id.*) Dr. O'Neill recommended a total

hip arthroplasty, which Plaintiff underwent on March 12, 2019. (Tr. 44, 475.) After the

total hip arthroplasty, Plaintiff reported during a April 7, 2019 post-procedure visit that

his "pain and mobility have improved significantly over the last few weeks" and that he

was "interested in returning to golf and other activities." (Tr. 477.)

### c.  Left toe amputation

Because of malignant melanoma found in Plaintiff's left great toe, Plaintiff

underwent an amputation of his left toe in May 2019. (Tr. 489–91, 514–15, 539.)

Afterwards, Plaintiff reported pain and balance issues. (Tr. 532.) On February 11, 2020,

as part of a dermatology consult and follow-up, Plaintiff reported that the redundant skin

on his amputated toe rubbed when he walked, causing him some discomfort and that he

experienced intense pain and burning in the plantar surface of his feet. (Tr. 606.)

## DISCUSSION

## I.   Standard of Review

The Commissioner's decision will be upheld if the decision is supported by

substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607

F.3d 533, 536 (8th Cir. 2010) (citations omitted). "Substantial evidence is less than a

preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations omitted). In other words, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). The whole record is considered, including "evidence that supports as well as detracts from the Commissioner's decision," and the Court will not reverse simply because some evidence may support the opposite conclusion. *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006). If it is "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings," the Commissioner's decision must be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

**II.    Analysis**

Plaintiff makes two arguments. He claims (1) substantial evidence in the record does not support the ALJ's findings that Plaintiff (a) does not equal a listed impairment at step three and (b) has a RFC of light exertional work; and (2) the ALJ erred in assigning

less weight to two medical opinions and failed to sufficiently address some medical opinions regarding his inability to work after his back surgery. (*See generally* Doc. No. 23, Pl.'s Mem. of Law in Supp. of Mot. for Summ. Judg. ("Pl.'s Mem.").) In response, the Commissioner argues that substantial evidence supports the ALJ's findings and that the ALJ properly evaluated the medical opinions in the record. (*See generally* Doc. No. 26, Def.'s Mem. in Supp. of Mot. for Summ. Judg. ("Def.'s Mem.").)

### 1.  Substantial evidence

#### a.  Step three – Listing 1.03

Plaintiff argues that substantial evidence does not support the ALJ's findings at step three that Plaintiff does not equal a listed impairment under Listing 1.03. Listing 1.03 requires a demonstration of "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, *with inability to ambulate effectively*, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03 (emphasis added). Listing 1.00B2b defines effective ambulation as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited

to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

§ 1.00B2b. The ALJ considered Listing 1.03 relating to Plaintiff's total hip replacement and concluded that Plaintiff did not meet the listing because the record did not support an inability to "ambulate effectively." (Tr. 13.)

Plaintiff argues that, contrary to the ALJ's findings, the record "very clearly provides multiple objective clinical or diagnostic findings" regarding his inability to ambulate effectively. (Pl. Mem. 10.) These "clinical or diagnostic findings," according to Plaintiff, include the following:

- three physical exams from treating physicians – one from Dr. Jones on September 29, 2017, which indicated that Plaintiff had a "very compromised" and "unsteady" gait (Tr. 377), and two others (one from Dr. Transfeldt in October 2017 and one from Dr. O'Neill in January 2019) which indicated Plaintiff had an "antalgic gait"[3] (Tr. 405, 474);

- hospital records from North Memorial Health showing Plaintiff was issued a walker after his right hip surgery (Tr. 449–50); and

- oncology reports from the Mayo Clinic that, after his left toe was amputated due to melanoma, he had issues with balance. (Tr. 532.)

Although Plaintiff suffered at times from an antalgic gait, the record demonstrates that Plaintiff's ability to ambulate improved significantly after his back and hip surgeries

---

[3]    An antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures . . . characterized by a very short stance phase." *Dorland's Illustrated Medical Dictionary* at 753 (32nd ed. 2011).

and subsequent physical therapy. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling"). After his October 2017 back surgery, Plaintiff had "significant improvement" and returned to playing golf and biking. (Tr. 420, 424.) By October 2018, a year later, Plaintiff "remain[ed] fairly active." (Tr. 424.) Physical therapy records from October 30, 2018, noted that Plaintiff demonstrated a "nonantalgic gait," "heel and toe walking," and was able to walk two to four city blocks. (Tr. 510.) By November 29, 2018, Plaintiff had improved in walking distance. (Tr. 504.) After his February 2019 hip surgery, physician assistant Jennifer Greseth of Twin Cities Orthopedics noted on April 7, 2019, that Plaintiff had returned to a "[n]ormal gait" and his "pain and mobility . . . improved significantly." (Tr. 477.) And on June 3, 2020, a neurological examination at the Mayo Clinic noted that Plaintiff's gait was normal. (Tr. 674.) These records demonstrate substantial evidence that Plaintiff was able to ambulate effectively.

Moreover, while Plaintiff may have suffered some limitation in his ability to walk starting in 2017, "ineffective ambulation requires the extreme limitation of walking ability that interferes very seriously with his ability to conduct activities independently." *Dereschuk v. Colvin*, No. 15-CV-86 (TNL), 2016 WL 9454329, at *21 (D. Minn. Mar. 28, 2016), *aff'd sub nom., Dereschuk v. Berryhill*, 691 F. App'x 292 (8th Cir. 2017). Here, the record demonstrates that Plaintiff, despite some issues, did not suffer the kind of "extreme limitation" that prevented him from doing many kinds of daily activities, including golfing and biking. *Id.* Additionally, Plaintiff's intermittent use of a rolling walker is not indicative that Plaintiff could not ambulate effectively, especially here

where Plaintiff significantly improved after surgery. *Id.* ("Plaintiff's intermittent use of a cane shows that he has at least sufficient lower extremity functioning to permit independent ambulation without the use of a cane."); *see also Beals v. Berryhill*, No. 16-cv-6013, 2017 WL 508202, at *4 (W.D. Ark. Feb. 7, 2017) (finding the record contained substantial evidence that the plaintiff was able to effectively ambulate where plaintiff, who underwent a bilateral total knee arthroplasty and was discharged home with a rolling walker, improved after her bilateral knee replacement surgery and subsequent physical therapy).

Finally, though Plaintiff reported "some issues" in June 2019 with balance following his toe amputation, he also reported that he was "gradually getting" used to his absent left toe and did not report any issues with being able to ambulate effectively. (Tr. 532.) Nor did his physical examination reveal any issues with ambulation. (Tr. 532–33.) Accordingly, this Court finds that substantial evidence supports the ALJ's decision that Plaintiff did not meet Listing 1.03 because the record did not support an inability to "ambulate effectively."

### b. Step three – Listing 1.04

Plaintiff also argues that substantial evidence does not support the ALJ's findings at step three that Plaintiff does not equal a listed impairment under Listing 1.04. Listing 1.04 requires the following:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

13

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The ALJ considered Listing 1.04 relating to

Plaintiff's spine issues and concluded that Plaintiff did not meet this listing because the

record did not demonstrate:

compromise of a nerve root (including the cauda equine) or the spinal cord with (A) evidence of nerve root compression characterized by neuro anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight-leg raising; (B) spinal arachnoiditis; or (C) lumbar spinal stenosis resulting in pseudoclaudication.

(Tr. 13–14.)

Plaintiff argues that the ALJ's finding is "repeatedly contradicted" by the record.

(Pl.'s Mem. 11.) For support, Plaintiff points to the following evidence:

- A September 2017 examination by a medical doctor who noted Plaintiff had a positive straight-leg test as well as decreased sensation and weakness (Tr. 375–78);

- An October 2017 lumbar spine MRI which showed disc degeneration, narrowing of spinal canal and foramen, diffuse disc bulges and protrusions

14

with an annular fissure, "[s]evere spinal canal narrowing" with impingement of the nerve roots, and bilateral facet arthropathy (Tr. 312);

- An October 2017 examination by a medical doctor who noted Plaintiff had an antalgic gait and decreased reflexes and sensation (Tr. 338–47; 404–07);

- A June 2018 examination by a medical doctor who noted Plaintiff had decreased sensation (Tr. 420);

- A June 2018 EMG that produced "electrodiagnostic evidence of acute denervation in the right and left S1 myotomes consistent with acute S1 radiculopathies bilaterally" (Tr. 352–54); and

- A June 2020 EMG that produced "chronic right L5 radiculopathy." (Tr. 641.)

Plaintiff does not indicate which of the subparts of Listing 1.04 he expected to meet. From the record though, there are no reports within Plaintiff's medical history of spinal arachnoiditis under subpart B. Indeed, a July 9, 2018 doctor's note from Dr. Transfeldt indicated that Dr. Transfeldt did not feel that Plaintiff had "any obvious arachnoiditis to account for [his] symptoms" of lower back pain, and a December 9, 2019 note from physician assistant Martha Magnuson reported that "[t]here is no evidence of fracture, neoplasm, arachnoiditis." (Tr. 422, 594.)

Additionally, as noted above, substantial evidence supports the ALJ's finding that Plaintiff was able to ambulate effectively, thus Plaintiff's spinal stenosis does not meet subpart C, which requires an inability to ambulate effectively. Moreover, Plaintiff's own treating physician, Dr. Transfeldt, indicated that he was "really not comfortable in suggesting that the spinal stenosis is the cause of [Plaintiff's] symptoms." (Tr. 424.)

This leaves subpart A. As stated above, to meet subpart A, Plaintiff must show evidence of nerve root compression characterized by neuroanatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness), accompanied by sensory or reflex loss, and if there is involvement of the lower back, positive straight-leg raising. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The record demonstrates that Plaintiff did suffer for a time from "[s]evere spinal canal narrowing" in the L4-5 region of Plaintiff's spine and that Plaintiff at one point had decreased sensation and positive straight-leg raising, as Plaintiff cites above. (Tr. 375–78.) However, to establish a claim for benefits, a claimant must show that he is disabled, meaning that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or *which has lasted or can be expected to last for a continuous period of not less than 12 months*." 42 U.S.C. § 423(d)(1)(A) (emphasis added).

Here, substantial evidence in the record shows that Plaintiff's "pre-operative nerve root compression lasted less than twelve months" and thus supports the ALJ's finding that Plaintiff's back impairment "did not meet listing 1.04(A)." *Castro v. Saul*, 824 F. App'x 441 (8th Cir. 2020); *see also Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006) (upholding denial of benefits where plaintiff failed to demonstrate that his impairment met listing for continuous 12-month period). For example, on October 2, 2017, Plaintiff received an MRI which indicated a severe spinal canal narrowing at the L4-5 disc region. (Tr. 312.) But after Plaintiff's lumbar laminectomy on October 24, 2017, a second MRI on December 18, 2017, showed "decompression of the spinal canal" at the L4-5 region due to the laminectomy and indicated that his "central stenosis, and subarticular stenosis and the canal ha[d] been completely decompressed." (Tr. 310, 420.) By December 20,

2017, Plaintiff's straight leg raises were negative bilaterally. (Tr. 365.) And by January 9, 2018, an examination showed 5/5 extremity strength bilaterally (Tr. 416.) On June 8, 2018, Dr. Transfeldt indicated that Plaintiff now felt "significant relief of his symptoms" after the decompression with "straight leg raising to 90 degrees on both sides with hamstring tightness, but no signs of nerve root tension." (Tr. 420.) Dr. Transfeldt also felt comfortable that Plaintiff could continue "playing golf and his day-to-day activities." (*Id.*) On June 28, 2018, a physical exam showed that Plaintiff had no focal atrophy in his lower limbs. (Tr. 352.) Plaintiff's recovery continued to show improvements, including further negative straight leg raises on October 30, 2018, and February 27, 2019, and further indication that his motor strength and sensation were normal. (Tr. 474, 544, 624.)

Thus, not only did Plaintiff's pre-operative nerve root compression last less than twelve months, but after his back surgery, Plaintiff stopped exhibiting the additional criteria required to meet subpart A, including positive straight-leg raising, muscle atrophy, and limitation of motion of the spine. Therefore, substantial evidence in the record supports the ALJ's finding that Plaintiff's back impairment did not meet Listing 1.04(A), or, as already reasoned above, Listings 1.04(B) and (C).

### c. RFC

Plaintiff argues that substantial evidence does not support the ALJ's finding that he was capable of performing "light exertional work." (Pl.'s Mem. 12.) The ALJ found that Plaintiff was capable of performing light exertional work with environmental and postural limitations, occasional use of foot controls bilaterally, and the opportunity to alternate between sitting and standing as frequently as every 30 minutes, provided he

17

would not be off task greater than 10% of the time. (Tr. 14.) As support for this finding, the ALJ observed that Plaintiff's examinations indicated that Plaintiff's gait and strength were normal and that his symptoms were well controlled with consistent treatment and medication. (Tr. 15–18.)

Indeed, as already referenced above, substantial evidence in the record supports these findings that Plaintiff's gait and strength were normal. (Tr. 405, 416, 424, 477, 510, 544, 674.) Additionally, multiple examinations, treatment notes from doctors, and Plaintiff's own reporting indicate that Plaintiff's symptoms were not only well controlled with consistent treatment, but significantly improved after Plaintiff's surgeries. (Tr. 352, 367, 418, 420, 422, 477, 594, 606, 645.) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (quotation omitted). Moreover, Plaintiff reported continuing physical activity, including biking, golfing, lifting weights, going to the gym, and swimming. (Tr. 418, 420, 424, 503.) These observations and reports provide substantial evidence to support the ALJ's finding that Plaintiff was capable of performing "light exertional work," with the limitations that included postural limitations and only occasional use of foot controls bilaterally to account for symptoms related to Plaintiff's lumbar spine, total hip replacement, and left big toe amputation, as well as the opportunity to alternate between sitting and standing as frequently as every 30 minutes, provided Plaintiff would not be off task more than 10% of the time. (Tr. 18.)

Plaintiff acknowledges that his treatment has decreased his symptoms and functional problems. (Pl.'s Mem. 12.) But he maintains that he continues to experience

severe pathology and cites his June 2020 EMG, which confirmed ongoing lumbar radiculopathy. The record, however, does not demonstrate, nor does Plaintiff indicate, how Plaintiff's ongoing lumbar radiculopathy prevents him from performing "light exertional work." Additionally, as already noted, Plaintiff's lumbar radiculopathy does not appear to prevent Plaintiff from engaging in the numerous physical activities cited above.

Plaintiff also takes issue with the ALJ's reasoning that Plaintiff's "relatively infrequent medical appointments without need for additional surgical intervention" supports his RFC. (Tr. 18.) Plaintiff asserts "[t]his is a ludicrous conclusion to draw that is unfounded in the law and medicine." (Pl.'s Mem. 12–13.) But an ALJ can consider conservative and infrequent treatment in evaluating a disability claim. *See Pierce v. Kijakazi*, 22 F.4th 769, 773 (8th Cir. 2022) (finding conservative treatment supported the RFC); *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) (concluding infrequency of attempts to treat condition were inconsistent with the severity of the plaintiff's complaints).

Accordingly, substantial evidence supports the ALJ's RFC finding that Plaintiff was capable of performing light exertional work with environmental and postural limitations; occasional use of foot controls bilaterally; and the opportunity to alternate between sitting and standing as frequently as every 30 minutes, provided he would not be off task greater than 10% of the time.

### 2. Medical opinions

Finally, Plaintiff argues that the ALJ failed to assign full weight to the opinions of physician assistant Rachel Montague and Dr. Ensor E. Transfeldt. For claims like Plaintiff's that were filed on or after March 27, 2017, the weight assigned to medical opinions is governed by 20 C.F.R. § 404.1520c. *Pemberton v. Saul*, 953 F.3d 514, 517 n.2 (8th Cir. 2020). Under this regulation, the ALJ does not defer to any medical opinions, including opinions from the claimant's treating medical sources. 20 C.F.R. § 404.1520c(a). The ALJ instead considers all medical opinions according to five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(c). Supportability[4] and consistency[5] are the most important factors, and the ALJ must explain how those two factors were considered in determining the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(b)(2). The ALJ is not required to explain the remaining factors unless the ALJ "find[s] that two or

---

[4]    The regulations define the factor of "supportability" as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1)

[5]    The regulations define the factor of "consistency" as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). The word "consistent" in the regulations "is the same as the plain language and common definition of 'consistent'" and "includes consideration of factors such as whether the evidence conflicts with other evidence from other medical sources and whether it contains an internal conflict with evidence from the same medical source." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854 (Jan. 18, 2017).

more medical opinions . . . about the same issue are both equally well supported . . . and consistent with the record . . . but are not exactly the same." 20 C.F.R. § 404.1520c(b)(2)-(3).

### a. Physician assistant Montague's January and February 2018 opinions

Plaintiff argues the ALJ erred in assigning less weight to physician assistant Montague's January and February 2018 opinions. As background, Montague's January 2018 opinion offered restrictions following Plaintiff's lumbar back surgery, including no *prolonged* sitting, standing, driving; limited twisting and bending; and no lifting greater than 10-15 pounds. (Tr. 414.) She continued with these same restrictions in February 2018 with the exception that Plaintiff could lift no greater than 20 to 25 pounds. (Tr. 419.) The ALJ found Montague's opinion consistent with Plaintiff's exertional work activities and cited Montague's supporting observations. (Tr. 19.) The ALJ thus found Montague's opinions "mostly persuasive"; however, the ALJ found Montague's statements vague regarding how long Plaintiff could perform each activity because she did not define the word "prolonged." (*Id.*) Plaintiff argues this was not an acceptable reason to find Montague's opinion less persuasive.

Contrary to Plaintiff's assertion, however, this was an acceptable reason to find Montague's opinion less persuasive as it indicated that Montague's opinion contained less relevant "supporting explanations" and therefore less supportability. 20 C.F.R. § 404.1520c(c)(1); *see Wilson v. Saul*, 4:19 CV 1000 RWS, 2020 WL 836396, at *8 (E.D. Mo. Feb. 20, 2020) (affirming decision where ALJ found opinion regarding "prolonged

sitting" vague). Thus, the ALJ did not err in assigning less weight to Montague's use of the word "prolonged," which did not provide any quantifiable work-related limitations.

### b. Dr. Transfeldt's and Montague's 2017 and 2018 opinions

Plaintiff also argues that the ALJ did not sufficiently address Dr. Transfeldt's and physician assistant's Montague's 2017 and 2018 opinions advising that Plaintiff should be out of work for a period of time following his back surgery. (Tr. 410, 413–19.) Under 20 C.F.R. § 404.1520c(b), the ALJ must "articulate" how persuasive he or she finds "all of the medical opinions and all of the prior administrative medical findings" in a claimant's case record. Here, though the ALJ addressed Montague's January 9, 2018 and February 16, 2018 opinions temporarily restricting Plaintiff from work due to his post-surgery recovery, there is no indication in the ALJ's decision that the ALJ considered the portion of Montague's 2018 opinions regarding Plaintiff's temporary working restriction. Similarly, the ALJ's opinion does not reflect any consideration of Montague and Dr. Transfeldt's 2017 opinions also advising work restrictions after Plaintiff's surgery.

That said, it is clear from the record that Dr. Transfeldt's and Montague's work restrictions were temporary and did not indicate an assessment of Plaintiff's long-term functional capacity. Indeed, by February 14, 2018, only a few months after the October 24, 2017 surgery, Montague noted that she hoped Plaintiff would "continue to make good improvements" and would be able to return to work. (Tr. 418.) By June 8, 2018, the next follow-up with Plaintiff, Dr. Transfeldt told Plaintiff that he could "carry on playing golf and his day-to-day activities" and did not prescribe any restrictions. (Tr. 420.) Similarly, on July 9, 2018, Dr. Transfeldt reassured Plaintiff that he did not need any further surgery

and recommended a one-year follow-up. (Tr. 422.) Thus, Dr. Transfeldt's and

Montague's work restrictions were only temporary. Accordingly, even if the ALJ may

have erred by not addressing these opinions, it is clear that "t]here is no indication that

the ALJ would have decided differently" and thus "any error by the ALJ was therefore

harmless." *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008).

In sum, the ALJ did not err in assigning less weight to Montague's use of the word

"prolonged." Additionally, even if the ALJ had erred in failing to address the 2017 and

2018 opinions of Montague and Dr. Transfeldt (which advised that Plaintiff should be

temporarily restricted from work as he recovered from his back surgery), the ALJ's error

was harmless.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff's Motion for Summary Judgment (Doc. No. 22) be **DENIED**;

2.  Defendant's Motion for Summary Judgment (Doc. No. 25) be **GRANTED**;

and

3.  Judgment be entered accordingly.

Date: June 6, 2022                          *s/ Becky R. Thorson*
                                            BECKY R. THORSON
                                            United States Magistrate Judge

## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).